**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**(CORPUS CHRISTI DIVISION)**

| | | |
|---|---|---|
| IN RE:  FOUR MILE TREE, LLC | § | |
| | § | **CHAPTER 11 CASE NO. 13-20560** |
| Debtor | § | |

# DISCLOSURE STATEMENT
# ACCOMPANYING THE
# CHAPTER 11 PLAN OF REORGANIZATION

# OF

# FOUR MILE TREE, LLC

Shelby A. Jordan
sjordan@jhwclaw.com
State Bar No. 11016700
Fed. Bar No 2195
*Jordan, Hyden, Womble,  Culbreth*
*& Holzer P.C.*
500 North Shoreline, Suite 900
Corpus Christi, Texas 78401
Telephone:   (361) 884-5678
Facsimile:   (361) 888-5555
ATTORNEYS FOR THE DEBTOR

Dated:  November 20, 2013.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | SUMMARY OF DISCLOSURE STATEMENT PROCESS | 3 |
| 2 | PLAN DEFINITIONS | 5 |
| 3 | PURPOSE OF THE DISCLOSURE STATEMENT | 5 |
| 4 | REQUIREMENT TO VOTE ON THE PLAN | 6 |
| 5 | EXHIBITS TO THE DISCLOSURE STATEMENT OR EXHIBITS AVAILABLE TO CREDITORS | 8 |
| 6 | HISTORY OF THE DEBTOR AND SUMMARY OF PLAN | 8 |
| 7 | PRESENT FINANCIAL CONDITION OF THE DEBTOR | 16 |
| 8 | UNDERSTANDING THE CONTENTS OF THE PLAN – PROVISIONS FOR TREATMENT OF ALL CLASSES | 19 |
| 9 | INSIDERS AND AFFILIATES TO THE DEBTOR | 28 |
| 10 | PRESENT CONDITION OF THE DEBTOR | 28 |
| 11 | VOTING CONSIDERATIONS | 29 |
| 12 | ALTERNATIVES TO THIS PLAN | 30 |
| 13 | LITIGATION IN INSOLVENCY AND NON-INSOLVENCY CONTEXT | 31 |
| 14 | RISKS OF PLAN | 33 |
| 15 | CREDITORS COMMITTEE | 33 |
| 16 | REQUEST FOR APPROVAL | 34 |

Four Mile Tree, LLC as Debtor and Debtor-In-Possession ("Debtor" or "4MT"), has proposed its Chapter 11 Plan of Reorganization, and is joined by the Estate of William O. Harrison, Jr. (the "Probate Estate") as Co-Proponent of this Plan, hereby submit this Disclosure Statement pursuant to the requirement of the United States Bankruptcy Code, 11 U.S.C. § 101, *et. seq.* (herein the "Code") as follows:

## 1.     SUMMARY OF DISCLOSURE STATEMENT PROCESS

### A.     FILING OF THE PLAN

The Chapter 11 Plan of Reorganization was filed on November 20 2013, and the Plan of Reorganization filed simultaneously with this Disclosure Statement (herein the "Plan", a copy of which is attached hereto as Exhibit 1). The Debtor filed this Disclosure Statement on November 20, 2013 (herein called "Disclosure Statement"). This Disclosure Statement is being furnished to all Creditors and Parties-In-Interest of Four Mile Tree, LLC as Debtor-In-Possession under its Chapter 11 proceeding.

### B.     BANKRUPTCY CODE REQUIREMENTS

The Bankruptcy Code (Title 11 U.S.C. § 101, *et seq.*) requires that "Adequate Information" be furnished to all Creditors or Parties-In-Interest, consisting of a full and adequate disclosure by the Debtor-In-Possession of its historical, current and anticipated future financial and business affairs, so that Creditors and other Parties-In-Interest can make an informed decision concerning any vote they may cast either in favor of, or in opposition to, any proposed Plan.

### C.     GENERAL CONTENT OF THIS DISCLOSURE STATEMENT

#### 1.1.    Objections Process as a Pre-Condition To Your Reliance On This Disclosure Statement

**THE BANKRUPTCY COURT MUST APPROVE THIS DISCLOSURE STATEMENT AS FURNISHING "ADEQUATE INFORMATION" ONLY AFTER YOU HAVE RECEIVED NOTICE OF THE FILING AND AN OPPORTUNITY TO BE HEARD IF YOU OBJECT TO THE ABSENCE OF "ADEQUATE INFORMATION."**

**IF YOU FAIL TO OBJECT AFTER NOTICE, YOU MAY BE FOREVER BARRED OR ESTOPPED FROM COMPLAINING OF THE CONTENTS OR LACK OF CONTENTS OF THIS DISCLOSURE STATEMENT.**

The Debtor, its representatives, agents, attorneys, accountants, officers and directors, are relying upon entry of the Bankruptcy Court's Order Approving this Disclosure Statement prior to

their (or any one of their) participation in furnishing any Creditor or Party in Interest the information herein contained.

You are specifically referred to the terms and conditions of the Plan as filed and you are cautioned that this Disclosure Statement may not be relied upon as a substitute for a full and complete reading of the Plan or a full and complete review of all supplements and amendments which may be allowed and approved by the United States Bankruptcy Court [herein the "Court," as defined in the Plan].

**THE PLAN MAY BE AMENDED AND SUPPLEMENTED AFTER THIS DISCLOSURE STATEMENT IS FURNISHED TO YOU, UNDER CERTAIN LIMITED CRITERIA.**

### 1.2.    Sophisticated Nature of the Creditors

The Debtor's Plan deals with the reorganization of non-consumer debt held by business, sophisticated Creditors and Parties-In-Interest, and for that reason, the Debtor considers the Creditors as sophisticated business persons and has included substantial information concerning operations, projections and analysis intended to furnish an adequate level of financial information, which should be reviewed only after each creditor has a complete understanding of the Plan terms.

### 1.3.    Materiality of the Disclosure Statement and Its Intended Use

The Debtor has prepared this Disclosure Statement to disclose information, which in its opinion is material, important and necessary to make an evaluation of the Plan.  **THE PLAN IS ATTACHED HERETO AS EXHIBIT 1.**  The material herein contained is intended solely for the purpose and solely for the use of known creditors and Parties-In-Interest, and accordingly, may not be relied upon or any purpose other than in making a determination of how to vote on the Plan.  In addition materials contained in this Disclosure Statement are not necessarily fully sufficient for each creditor to make the necessary judgment of the preferability of any alternative to the Plan based on the Creditor's own special circumstance.

### 1.4.    Disclaimers

This Disclosure Statement provides a number of disclaimers, which are usually made in capitalized, bold print throughout.  The disclaimers are intended to draw your attention to areas of the Plan which are most likely to have an adverse impact upon the Creditors to which they refer, or to opinions of the Debtor which are subject to dispute, argument, or unknown factors and whose reliability should be fully perceived.

**IT IS THE DUTY OF CREDITORS, WHEN A DISCLAIMER IS MADE, TO FURTHER INVESTIGATE THE NATURE OF THE INFORMATION TO WHICH THE DISCLAIMER IS BASED. ALTHOUGH THE DISCLAIMER DOES NOT DISCLAIM KNOWING MISINFORMATION, IT DOES PUT CREDITORS ON**

**NOTICE THAT THIS DISCLOSURE STATEMENT MAY CONTAIN MISINFORMATION [such as accounting procedures not complying with generally accepted accounting procedure or policy] OR PROJECTIONS WHOSE RELIABILITY SHOULD BE QUESTIONED OR REVIEWED.**

**2.      PLAN DEFINITIONS**

Reference is made to the definitions in the **Glossary of Plan Definitions** attached to the Plan that must be considered in conjunction with this Disclosure Statement.  All capitalized terms used herein shall, unless the context otherwise requires, have the meaning set forth in the Plan or the Bankruptcy Code.   Some terms defined herein, are defined in the sections in which they are used.

**3.      PURPOSE OF THE DISCLOSURE STATEMENT**

The Bankruptcy Code (Title 11 U.S.C. § 101, et seq.) requires that "Adequate Information" be furnished all Creditors or Parties-In-Interest, consisting of a full and adequate disclosure by the Debtor in Possession of its historical, current and anticipated future financial and business affairs, so that Creditors and other Parties-In-Interest can make an informed decision concerning any vote they may cast either in favor of, or in opposition to, any proposed Plan. THE LAST DAY TO DO SO IS   _____, **2014.**

Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement has been presented to the Bankruptcy Court for approval as containing ADEQUATE INFORMATION for each holder of Claims or Interests to make an informed decision concerning each Creditor's vote respecting the Plan.

Such approval is required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby. Interested parties are referred to 11 U.S.C. §1125, which reads in part as follows:

"(a)    An acceptance or rejection of a plan may not be solicited after the commencement of a case under its title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.   The Court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

"(b)    Whether a disclosure statement contains adequate information is not governed by any otherwise applicable non-bankruptcy law, rule or regulation, but an agency or official whose duty is to administer or enforce such law, rule, or regulation may be heard on

the issue of whether a disclosure statement contains adequate information.  Such an agency or official may not appeal from an order approving a disclosure statement.

"(c)     A person that solicits, in good faith and in compliance with the applicable provisions of its title, or that participates, in good faith in compliance with the applicable provisions of its title, in the offer, issuance, sale or purchase of a security, offered or sold under the plan of the debtor, or a newly organized successor to the Debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule or regulation governing the offer, issuance, sale or purchase of securities."

## 4.     REQUIREMENT TO VOTE ON THE PLAN

### 4.1.     Filing a Proof of Claim

A Creditor or Interest Holder, in order to vote on the Plan, must have filed a Proof of Claim or Proof of Interest at or prior to the Claims Bar Date unless scheduled as not disputed, liquidated **and** not contingent in this Chapter 11 Case, whichever is appropriate.  Any Creditor scheduled as NOT DISPUTED, LIQUIDATED AND NOT CONTINGENT is, to the extent scheduled only, deemed to have filed a Proof of Claim and, absent objection, such Claim is deemed Allowed.

A Creditor or Interest Holder may vote to accept or reject the Plan by filling out and mailing to the Bankruptcy Court Clerk the Ballot which has been provided such Creditor.

**The last day to file Claims in its Estate was set by the Court as _____, 2014.**

### 4.2.     Ballot Deadline

The Court has fixed _____ **2014**, as the last day by which Ballots must be filed with the Court AND furnished to the Debtor's Attorney.  No vote received by the Court after such time will be counted.  Whether or not a Creditor or Interest Holder votes on the Plan, such person will be bound by the terms and treatment set forth in the Plan IF THE PLAN IS ACCEPTED by the requisite majorities of Classes of Creditors and interest Holders and/or confirmed by the Court.  Absent some affirmative act constituting a vote, such Creditor or Interest Holder will not be included in the tally.  Allowance of a Claim or interest for voting purposes, and disallowance of any Claim or interest for voting purposes does not necessarily mean that all or a portion of the Claim or interest will be Allowed or Disallowed for distribution of dividends purposes.

### 4.3.     Acceptance of the Plan

ACCEPTANCE OF THE PLAN:  In order for the Plan to be accepted by Creditors, a majority in number and two-thirds (2/3) majority in amount of Claims filed and Allowed (for voting

purposes) and voting of each impaired class of creditors in each Chapter 11 proceeding must vote to accept the Plan.  In order for the Plan to be accepted by Interest Holders, the two-thirds (2/3) majority in amount of interests Allowed (for voting purposes) and voting of each impaired class of interests in each Chapter 11 proceeding must vote to accept the Plan.  You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed Ballot, which the Court furnished you - with a copy to counsel for the Debtor.  Please be sure to properly complete the form and legibly identify the name of the claimant or interest holder.

**EVEN IF A PARTICULAR CREDITOR VOTES TO REJECT THE PLAN, THE PLAN MAY STILL BECOME BINDING UPON SUCH CREDITOR.**

**4.4.    Solicitation**

The Debtor, the Creditors' Committee, or others may solicit your vote BUT ONLY AFTER THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT AS PROVIDED ABOVE.

**HEARING ON OBJECTIONS TO CONFIRMATION OF THE PLAN IS SET FOR _____, 2014, AND SUCH HEARING SHALL BE CONDUCTED ONLY ON ANY TIMELY FILED OBJECTIONS AT THE HEARING ON CONFIRMATION OF THE PLAN.**

Report any violations to the Debtor, or the Bankruptcy Court.  No representative of the Debtor shall receive any additional compensation for any solicitation.

**4.5.    Representations Concerning The Debtor**

**NO REPRESENTATIONS CONCERNING THE DEBTOR, OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE WHICH ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON, AND SUCH REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT.**

**4.6.    Plan Deadlines**

The following is a listing of the various Plan Deadlines, and includes certain deadlines imposed by the Rules of Bankruptcy Procedure.  Its summary is intended only as an assistance **BUT CANNOT BE RELIED UPON AS AN ACCURATE AND COMPLETE LIST OF THE VARIOUS DEADLINES WHICH MAY ADVERSELY AFFECT A CREDITOR'S CLAIM OR RIGHTS WITH RESPECT TO THE PLAN OR THE DEBTOR.**

### 4.6.1.   Claims Bar Deadline

**The Court has fixed _____, 2014, as the last day by which proofs of claims could be filed in this bankruptcy proceeding.  The Plan provides that all Allowed Claims must be timely filed unless scheduled by the Debtor prior to the Bar Date as undisputed, liquidated and non-contingent.**

### 4.6.2.   Objections to Claims

Objections to Claims shall be filed with the Court and served upon each holder of each of the Claims to which objections are made not later than sixty (60) days after the Effective Date unless otherwise set by the Court in the Order of Confirmation.

## 5.   EXHIBITS TO THE DISCLOSURE STATEMENT OR EXHIBITS AVAILABLE TO CREDITORS

Pursuant to the provisions of the Plan, the following Exhibits are incorporated in this Disclosure Statement as being attached hereto and shall, upon entry of the Order Confirming the Plan [which shall likewise attach to such Order the following Exhibits, as approved]; are incorporated at Confirmation Date, into the Debtor's Plan as if fully set forth therein *verbatim:*

Exhibit 1 -   Plan of Reorganization
Exhibit 2 -   2012 RIST RESEARCH & APPRAISAL - a summary will be attached in lieu of the complete appraisal.  Any party desiring a copy of the complete appraisal will have a digital copy furnished upon request of Counsel for the Debtor, Shelby A. Jordan, sjordan@jhwclaw.com.
Exhibit 3 -   2013 Simerlein Appraisals, Ltd. Appraisal – a summary will be attached in lieu of the complete appraisal.  Any party desiring a copy of the complete appraisal will have a digital copy furnished upon request of Counsel for the Debtor, Shelby A. Jordan, sjordan@jhwclaw.com.

## 6.   HISTORY OF THE DEBTOR AND SUMMARY OF PLAN

### A.   SUMMARY OF THE PLAN

This Plan provides for the return of the collateral pursuant to § 1129(b)(2) and as provided in *Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1352 reh'g denied,* 889 F.2d 663 (5th Cir.1989); *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009); *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004), as payment in full of the secured calim of Old Point Bank..

Upon valuation by the Bankruptcy Court of Four Mile Tree and payment of the secured claim of Old Point National Bank of Phoebus ("Old Point Bank"), the Co-proponent shall pay the difference between the value on the Effective Date of this Plan, and any balance found due as an Allowed Unsecured Claim of Old Point Bank, either:

(i)     in cash on the Effective Date;  or

(ii)    over a period of 60 monthly installments of principal and interest, at a market rate of interest based on the 90-day Treasury Bill Rate plus 3.25 basis points (or as otherwise found by the Bankruptcy Court at the Confirmation hearing);  amortized over 25 years and in either event, the Co-Proponent shall pay, or cause to be paid:

    (a)    all such amounts provided in the 2013 appraisal of Simerlien as Stablilization Costs; and

    (b)    all amounts due or to become due up to 24 months of the Effective Date of the Plan as ad valorem taxes on 4MT; and

    (c)    all amounts due or to become due up to 24 months of the Effective Date of the Plan as CGL casualty insurance for improvements on 4MT; and

    (d)    all amounts due or to become due up to 24 months of the Effective Date of the Plan for caretaker costs described herein.

This aggregate financial responsibilities and payments are described herein as New Value.

## B.    BACKGROUND OF 4MT PLANTATION

Scholars have long recognized Four Mile Tree as one of the oldest and most prominent English settlements in America, with a genealogy that can be traced to the opening decades of the country's founding. It was first famed for having a landmark tree that was used as a mark to denote the boundary of Jamestown when its limits were defined in 1619 by Governor Samuel Argall. This property was soon patented by John Burrows who had arrived in Virginia as part of the Second Supply in 1608 and who was granted this land by 1625 as part of the headright system for transporting three servants to the new colony. His murder in 1628 eventually brought the estate into ownership of Capt. Henry Browne, and by July of 1637, when Browne finished his acquisition of the property, he had become the largest landowner in the county, giving him a plantation worthy of his status as a member of the Virginia Council.

Originally encompassing two thousand acres (8 km²), it was situated on the south side of the James River opposite Jamestown, four miles (6 km) further north. On a hill near the water's edge a handsome old house overlooks the river. This house with the whole plantation, was the estate of the Browne family, where they lived for two hundred years. The first owner, Colonel Henry Browne, was a member of Sir William Berkeley's Council in 1643. The house remains preserved in its original historical state.

In a nearby garden is the second oldest tombstone in Virginia [*citation needed*], dated January 7, 1650. It marks the grave of Alice Miles, daughter of John Miles, of Branton, Herefordshire, and wife of Colonel George Jordan, Attorney General of Virginia in 1670. The tombstone of Colonel William Perry of Westover, who died in 1637, is the oldest in Virginia.

The Four Mile Tree Plantation House is a brick structure, one-and-one-half-stories with

hip-on-gambrel roof, pedimented dormers and four interior end chimneys. The brick is laid in Flemish bond above the beveled water table with English bond below. The entire brick surface was stuccoed and scored in imitation ashlar in the nineteenth century but the stucco has deteriorated on portions of the facade and fallen off. All openings on the five-bay facade, except for the central entranceway, were altered in the late nineteenth century or early twentieth century and have two-over-two sash; the entranceway, sheltered by a nineteenth-century Roman Ionic porch, consists of a transom over three-paneled double doors, the top panel of each being scrolled. A modillioned cornice is used on the eaves.



### Four Mile Tree
#### U.S. National Register of Historic Places

Estate Manor, c. 1940

| | |
|---|---|
| **Nearest city:** | Surry, Virginia |
| **Area:** | 250 acres (100 ha) |
| **Governing body:** | Private |
| **NRHP Reference#:** | 70000826[1] |
| **Added to NRHP:** | December 18, 1970 |

Four Mile Tree's oldest interior woodwork is in the central stair hall where the turned balustrading on the stair, the heavy handrail and the high dado place the date in the first half of the eighteenth century. The southwest room, which probably dates from the early nineteenth century, has two framed niches flanking a simple mantel and over mantel topped by an architrave, frieze and cornice; only the cornice and a paneled dado ornament the other walls of the room. The remaining rooms have mantels, which seem to date from the first half of the nineteenth century but only in the southeastern room is there a paneled room.

Four Mile Tree is a successor to two of the earliest plantations in Virginia ("Burrow's Hill" and "Pace's Paine's"). It is "ancient" in its own right having been founded in the first half of the seventeenth century; its gravesite contains the oldest legible tombstone in Virginia (1650). Four Mile Tree was the seat of the Browne's, a leading Surry family, from the Reign of Charles I until the death of their last male heir in 1799.

---

[1]    "National Register Information System". *National Register of Historic Places*. National Park Service. 2010-07-09.

The plantation, named for its distance from Jamestown, was one of Surry County's more prosperous; its owners served as viewers of tobacco and had slaves from an early period. The Browne's were regularly Justices of the County Court throughout the colonial period. Several members of the family served on the Governor's Council or in the House of Burgesses during the seventeenth century. During the War for Independence, William Browne was a member of the Surry Committee of Safety and Lieutenant Colonel of Militia. His son, the last of his name to be Master of Four Mile Tree, was a lieutenant in the revolutionary militia. The British sacked the plantation during the War of 1812 according to the then Colonel of county militia. In 1815 the plantation passed to William Browne, Jr.'s granddaughter, Sally Elizabeth Bowdoin, and her husband, General Philip St. George Cocke.

Four Mile Tree has a cemetery, with the monument is said to be the oldest surviving cemetery monument in Virginia of Alyce Miles (deceased January, 1650), the wife of George Jordan, one of the original Jamestown settlers and one of the two original Jordan families. Colonel George Jordan was one of Surry County, Virginia's most prominent citizens. He was in the House of Burgesses at intervals for nearly 30 years, serving in the sessions of 1646-47, 1658-59, 1674-76. He was a Justice in Surry County in 1652 and afterwards was Attorney General for Virginia from 1667 to his death in 1678.

Below is the current boundary marks for Four Mile Tree:



The plantation remained in the Browne family for more than 200 years, and it was they who are largely responsible for giving the place the form we see today. A defining moment in the history of Four Mile Tree came in 1744 when William Brown II died.  He left instructions to his executors William Eater and Captain Richard Cocke to assist his widow in building her a  house, which  became the core of the surviving structure.  He seems to have already started preparation for construction, since dendrochronol[g]lical sampling of timbers in the house demonstrate that some were felled  as early as  the summer of 1743, with the  latest of this first construction  phase framing having been cut during the winter of 1744.

The property was later owned by relatives of Benjamin Harrison, a direct relative of Harrison.  As shown above, the remaining 4MT exceeds 300 and has numerous other historical significance.  For instance, in the cemetery is the tombstone of Colonel William Perry of Westover, who died in 1637, and is the oldest in Virginia.

**C.      THE PROBATE ESTATE OWNERSHIP OF 60% OF 4MT
         AND THE GUARANTY CLAIM LITIGATION**

Ownership of the Debtor is divided as follows:

| | | |
|---|---|---|
| i. | The Probate Estate | 60% |
| ii. | The Hank Harrison Trust | 20% |
| iii | The Hannah Harrison Trust | 20% |

Only the Probate Estate is a guarantor on the debt of the Debtor, which guaranty is subject to the Probate Estate Litigation described below.

**D.      THE PENDING PROBATE LITIGATION**

All Parties to this Chapter 11 are parties to the pending Nueces County Probate Court litigation in the probate Estate of William Henry Oliver Harrison, Jr., Deceased, Wayne Lundquist, Jr., in his Capacity as Independent Executor of the Estate, in County Court at Law # 4, Nueces County, Texas docket # 2011PR-00798-4, and the litigation commenced by Old Point Bank against the Estate Cause No. 2011PR-00798-4-A, and the Estate's Third Party Claim against the Debtor Four Mile Tree.

Harrison initially became interested in purchasing real property and improvements known as Four Mile Tree Plantation.  To that end, certain negotiations were undertaken based upon representations of value and representations that Old Point Bank wanted to finance the purchase. Four Mile Tree Plantation is a significant historical site.

Ultimately, Harrison arranged to purchase Four Mile Tree through a limited liability company, Four Mile Tree, LLC, that has maintained its principal place of business in Corpus Christi, Texas.  The negotiations involved assurances by Old Point Bank that it would finance the purchase in part.  As a result, and based upon direct participation by Old Point Bank, Four Mile Tree, LLC purchased the Four Mile Tree property and improvements for $4.5 million.   Of this purchase price, approximately $3.6 million was to be advanced by Old Point Bank.

However, in violation of Federal laws and the rules and regulations governing real estate loans made by Old Point Bank, no real estate appraisal had been obtained to support and qualify the advances made by Old Point Bank.   The commitment letter itself contained contradictory language, showing that the loan was to be secured by real estate (Old Point cannot argue that the loan was made on the strength of Harrison's financial statement alone) as follows:

> "***This commitment is contingent*** upon the receipt of a real estate appraisal, acceptable in form and content to the Bank, indicating a value of not less than $4,500,000.00.  **Borrower agrees to pay-down the loan principal if appraisal comes in at less than the purchase price of $4,500,000.000**.  [*See*, December 7, 2007 Loan Commitment, 2nd, pg. 2].

In fact, the commitment was not contingent upon receipt of a conforming appraisal as OCC Rules require – the commitment was converted into a loan ***without any appraisal***, based on the representations and the bank's need to close the loan before year end.

Harrison was not aware that both the banker and realtor anticipated that the property would not appraise for the purchase price, but was aware they needed to rush Harrison to close without the appraisal before years end.  Thus, on or about December 12, 2007 Harrison executed loan documents as the managing member of Four Mile Tree, LLC and personally executed a Guaranty of the same date, not having in hand any appraisal of the property and relying solely on his real estate agent and banker.

As a matter of fact and law, and then unknown to Harrison, the loan was illegal, void, and unenforceable.  In particular, at the time of the advances, Old Point Bank did not notify Harrison that the Four Mile Tree, LLC loan was illegal, and void as in violation Federal statutes, rules and regulations.  However, once Harrison executed his guaranty on this void and illegal loan, Old Point Bank then demanded an appraisal to support its illegal loan.  Having made the demand and facing the threat that Old Point Bank would accelerate its loan and foreclose, an appraisal was ordered by Old Point Bank showing that Four Mile Tree, LLC had materially overpaid on the purchase and had obtained advances in excess of the legal loan limits.

Upon delivery of the appraisal to Old Point Bank, Harrison was notified that he must pay Old Point Bank more than $300,000.00 (at the time Old Point Bank knew that its borrower Four Mile Tree, LLC did not have the financial capacity to make such payment) in order to reduce the principle balance to avoid discovery by the bank examiners of the illegal loan down to $3.375 million.  Ultimately the agreement was reached that he deposit for additional collateral a Certificate of Deposit in the amount of $300,000.00.

Harrison caused Four Mile Tree to post the CD, but did so long after he signed his guaranty of the illegal loan.  Harrison has never executed a new guaranty after the time that Old Point Bank made demand and ultimately brought its loan into conformity with the Bank's own rules and regulations, and the rules and regulations of the Office of the Comptroller of the Currency ("OCC").[2]  Nor has Harrison executed any renewal releases.

---

[2]      *See, e.g. Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.* No. 10-20634 (5th Cir., 2012)

Notwithstanding the fact that the loan upon which the Guaranty was based was void and illegal, Old Pont Bank began a series of demands and threats to sue the Estate on this Guaranty. In January 2012, Old Point Bank was given notice of the death of Harrison.  According to the terms of the Guaranty, notice of death constitutes a revocation of the Guaranty. Notwithstanding the notice, Old Point Bank continued to send demands, and threaten legal action on all of the illegal loan, as well as charges and interest accruing on the Note after notice of Harrison's debt.

Most incredibly, the bank now takes the position that the Four Mile Tree Plantation is valued less than $1.5 million.

## E.    FAIR MARKET VALUE APPRAISALS

There have been 4 appraisals, including the appraisal in January 2008 for $4.2 million described above that indicated a then-current fair market value of the 4MT plantation at $300,000.00 less than the purchase price.   As noted above, Harrison had been specifically told by his realtor and the officer of Old Point Bank that his purchase price was a "good deal."

Subsequent to the initial loan, and the death of Harrison, Old Point Bank sought a fair market value appraisal, and obtained the appraisal without the input of the Debtor (although the Debtor was charged for the costs and expenses of the appraisal).  That value is undisputed:

| | | |
|---|---|---|
| December 2011: | Rist Research - Old Point Appraisal: | $2.775 million |
| May 2012: | Rist Research - Old Point Bank Appraisal: | $2.775 million |

After Old Point Bank obtained its appraisal that was several hundred thousand dollars below the then-due balance on the Secured Claim of Old Point Bank, the Debtor obtained its MIA appraisal in 2013:

| | | |
|---|---|---|
| 2013 | Estate of Harrison and | |
| | Four Mile Tree Appraisal: | $3.070 million[3] |

The Debtor and the Co-Proponent believe, and will testify that the value of the 4MT plantation, once the stabilization funding has occurred and with the assumption of payment in full of the ad valorem taxes, is $3.07 million.

This litigation among these parties, and all litigation issues raised or which could be raised in the pending litigation, shall be settled by the terms of this Plan and the Confirmation of this Plan, contribution of the New Value, and the contributions required by the Co-Proponent of the Plan.

---

[3]     This value is subject to various requirements of stabilization, etc. with estimated costs of slightly more than $80,000.00.

The fair market value of this property is the most significant issue.  It is clear that Old Point Bank does not want to accept the property in lieu of the debt, or even a significant portion of the debt, based on proposals made that would have left more than $1 million deficiency claim.

## F.    LITIGATION IN THIS CHAPTER 11

It is likely that the only litigation in this Chapter 11 case will involve:

>    (i)    the value of 4MT Plantation;
>    (ii)    the credit due on the Allowed Secured Claim;
>    (iii)    the Allowed amount of any Class 5-B Claim of Old Point Bank, and
>    (iv)    the § 105 Plan Injunction in the event that Class 5-B is paid over time.

The Debtor argues that an underlying, and most significant aspect, of reaching a favorable ruling of "indubitable equivalence" necessarily defaults to a "valuation" of each property component.  As one court noted:

> We must agree that if the land being conveyed under the plan to [the oversecured creditor] is worth the amount of its claim, that the indubitable equivalent test is met and that the other objections raised would lack merit. The problem arises in determining whether the land offered is worth the amount of the claim. This is really more a practical problem than a theoretical problem. *And the cause of the problem is the debate inherent in establishing a value for real estate*.  *In re Walat Farms, Inc.*, 70 B.R. 330, 333 (Bankr. E.D. Mich. 1987) (footnote omitted). [Emphasis added.]

Bankruptcy courts cannot accomplish the goals of reorganization if required to do valuations from a premise that their own valuation determination must never turn out to have been less (or more) than the value ultimately realized.  In *In re Pacific Lumber Co.*, 584 F.3d 229, 248-249 (5th Cir. 2009) the Fifth Circuit recently reaffirmed that "]w]hat we have said before remains true":

> "Although we recognize that valuation is not an exact science, it remains an integral part of the bankruptcy process."

*Matter of Sandy Ridge,* 881 F.2d at 1354.

This reality stems from the need for appraisals arising from two important conditions:

- •     The heterogeneous nature of property as an investment class:  no two properties are identical, and all properties differ from each other in their location - which is one of the most important determinants of their value.
- •    However, of equal importance is the absence of a market-based pricing mechanism similar to the auto industries "blue book" or the stock market or commodity exchanges.

These two factors have determined the need for an expert appraisal and valuation of real property as the foundation of the bankruptcy process.  These two market factors likewise accounts for the distinction between "market value" and "market price."[4]

Market price is "the price at which one can transact" while market value is "the true underlying value" according to theoretical standards. *The "market value" concept is most commonly invoked in inefficient markets or disequilibrium situations where prevailing market prices are not reflective of true underlying market value.*  Market price becomes to equal market value when the market is informationally efficient and rational expectations prevail.  Serious recession periods, locally or nationally, drive a wide wedge between market value and market price.    Finally, fair market value is an analysis that does not depend on the parties involved.  Any secured party's argument that "much like beauty is in the eye of the beholder, so value (of collateral) is in the hands of the holder.  Presumably value could therefore differ depending solely upon whose hands are holding the collateral.  Presumably value could therefore differ depending solely upon whose hands are holding the collateral."

> "What about if the secured creditor was a widow, a real estate developer, a guardianship estate for a minor child, a doctor, a church, a blind man, a government agency, etc?  The list is endless.

*In re Peerman* 718, 722 (Bankr. W.D. Tex. 1989).  *Sandy Ridge I,* 881 F.2d at 1354 specifically rejected a creditor's argument that the bankruptcy court cannot set the value of property but must allow the foreclosure sale market to determine its price.

> *"*Although valuation hearings can be tedious, the valuation of assets is often necessary to define and protect the rights of the parties and is "an integral part of the confirmation process under Chapter 11."

*Sandy Ridge I,* 881 F.2d at 1354.

The confirmation process of this Plan will require a fair market value determination of the Bankruptcy Court, in light of the offer of future assurances through payments to accomplish the stabilization report criteria, the ad valorem tax payments, and the "caretaker" functions.

## 7.    PRESENT FINANCIAL CONDITION OF THE DEBTOR

For the year ended December 31, 2012, Four Mile Tree, LLC 's financial performance was exclusively based on contributions by Harrison and the Probate Estate.

---

[4]    Bankruptcy courts have held that when the secured collateral has been sold, or there is a sale involved, courts should use the actual sale price, and not some hypothetical evaluation, to determine the value of collateral for the purpose of plan confirmation and sale. *Ford Motor Credit Co.* v. *Dobbins,* 35 F.3d 860, 870 (4th Cir. *1994); Takisaki* v. *Alpine 'Group, Inc. (In re Alpine Group, Inc.),* 151 B.R. 931, 935 (9th Cir. BAP 1993); *Romley* v. *Sun Nat'l Bank (In re Two US" Corp.), 875* F.2d 240,244 (9th Cir. 1993). In this context, the sale price has been described as "conclusive evidence of the property's value." *In re Alpine Group, Inc.* at 935.    The problem in collateral surrender plans is that there is no fair market value sale available and often there is no financing even if an offer would be made with financing.

### 7.1     The Debtor's Assets and Valuation of those Assets

The appraisal summary above constitutes the only significant assets of the Debtor.

### 7.2     The Debtor's Liabilities

Old Point Bank is a nationally chartered banking corporation with its principal offices in Virginia.   Old Point Bank made a mortgage loan to Four Mile Tree, LLC, an entity owned by Harrison, who acted as guarantor.   The amount of the Secured Claim is slightly less than $3 million.

### 7.3.     The Debtor's Financial Forecasts

The Debtor forecasts the following financial performance for calendar year 2014, and the next 72 months (accrual basis) taking into account the anticipated debt restructuring as specifically provided in the Plan.   To the extent that the Class 5-B Allowed Unsecured Deficiency Claim is elected to be paid over 72 months, the collateral that the Estate will propose will be a part of the Confirmation hearing and subject to the determination of the Bankruptcy Court as adequate to secure the repayment of the Class 5-B Allowed Claim.

### 7.4.     Proposed Plan of Financial Reorganization of Four Mile Tree, LLC

The proposed Plan is either (i) payment in full at the Effective Date; or  (ii) an extension of debt maturity plan with a forecasted 100% payout pursuant to the Plan, after credit for the return of the 4MT Plantation at the fair market value determined by the Bankruptcy Court.

### 7.5.     Plan Feasibility and New Value

The Plan of Reorganization herein explained will allow the Debtor to operate and service debt within its historical cash flow of the Probate Estate; provide for satisfaction of all debts through business continuation and growth; and will not likely lead to the need for an additional reorganization.   The New Value consists of:

1.     funding of the administrative expenses of this Chapter 11 case;  and
2.     funding of the stabilization report work to bring the 4MT condition to the appraised Fair Market Value;  and
3.     funding of the ad valorem taxes for 24 months after the Confirmation Date;  and
4.     funding of the caretaker function for 24 months after the Confirmation Date;  and
5.     funding of any deficiency, if any, as found by the Court as credit is given for the return of the 4MT Collateral at the fair market value as determined by the Bankruptcy Court;  and
6.     funding of such other consideration as may be agreed by the Co-Proponent.

When compared with the results or return each creditor might realize under this Plan as opposed to a Chapter 7 liquidation, every creditor is substantially enhanced in the dollar value of debt repayment through implementation of the proposed Plan.  Most importantly, if the case is converted to Chapter 7, there will be no contributions by the Co-Proponent and most likely a foreclosure by the secured lender for an amount far below the fair market value, thus destroying any opportunity for a dividend to unsecured creditors, and eliminating all funds that could be available for administrative expenses.  It is a matter of law and fact that the Co-Proponent has no liability for either unsecured claims or administrative expenses other than confirmation of this Plan and the payment of the New Value.

New Value has been, and will be, invested by the Co-Proponent. The New Value contributed by the Plan Co-Proponent is paid in exchange for the § 105 injunction that shall (i) collectively and preliminarily enjoin all Entities from proceeding against the Debtor or the Probate Estate as the supplier of New Value pending such terms being set out in the Confirmation Order and thereafter until paid in full; and (ii) the permanent injunctions as provided in the Plan, Confirmation Order collectively enjoining all Persons and Entities from proceeding against the supplier of the New Value upon payment in full of such New Value.   For all purposes, the Adversary Rules of Procedure are invoked as a result of this Plan filing, to the extent that the Confirmation hearing shall determine the scope of the § 105 preliminary injunction against Old Point Bank post-confirmation until the New Value is paid in full, and the scope of the § 105 permanent injunction against Old Point Bank after the New Value is paid in full.

### 7.6.   Elements of Future Financial Reorganization

#### A.   Management

The Debtor has been managed by its Texas personnel, including Lynn Cates, the Debtor's designated manager, and Hank Harrison.

#### B.   Operations

Through implementation of the proposed collateral give back and Payment in Full provided in this Plan, the Reorganized Debtor can pay 100% of the Class 5 Allowed Unsecured Claim.

#### C.   Management Compensation

As part of the Plan, the Co-Proponent shall not be compensated until the Class 5 Claims are paid in full.

### 7.7.   Trade Creditors

Trade debt of the Debtor is approximately $20,000.00 as of the date of filing.  Those claims will be satisfied and discharged by this Plan as Class 5-A Claims by payment in full within 6 months of the Effective Date.

## 8.   UNDERSTANDING THE CONTENTS OF THE PLAN -- PROVISIONS FOR TREATMENT OF ALL CLASSES

### 8.1.   *Class 1 - Costs of Administration Including Professional Fees (Unimpaired)*

As provided by section 1123(a) (1) of the Bankruptcy Code, Administrative Claims for Professional Fees against the Debtor or the Bankruptcy Estate shall not be classified for purposes of voting.  All such Claims shall be treated separately as unclassified Claims on the terms set forth in the Plan.  Interest shall be as determined by the Bankruptcy Court, absent an agreement as provided in the Disclosure Statement.

(a)   Except as set forth in subsection  (b) below, each Administrative Claim shall be  paid in full in Cash on the Effective  Date; provided, however, that Allowed Administrative  Claims representing obligations  incurred  in the  ordinary  course  of  business  or otherwise assumed by the  Debtor pursuant to this  Plan shall be  paid or performed by the Debtor in accordance  with  the  terms  and   conditions  of  each  agreement relating thereto  and consistent  with  past practice as or as otherwise agreed to by both parties.

(b)   Compensation and Reimbursement. All Holders of Administrative Claims for  compensation  for  fees  or  reimbursement  of  expenses  by  the Bankruptcy Court   under sections   503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall  be  paid in Cash in  full in such amounts as are allowed by the  Bankruptcy Court,  (a) upon the  later of (i) the Effective  Date  or  (ii) the   date  upon  which  the  Bankruptcy Court  enters an  order with respect  to any  Administrative  Claim; or (b) upon   such other  terms  as the Holder of the Administrative Claim may accept.

(c)   All U.S. Trustee fees shall be paid in cash upon Confirmation as a Class 1 Claim.  All Post-Confirmation U.S. Trustee's fees shall be  paid based upon Monthly Operating Reports until the case is closed.

### 8.1.2.   *Class 2– Priority Tax Claims*

Not only are all Priority Tax Claims paid on the Effective Date, the Debtor proposes to pay up to 24 months of the ad valorem tax accruals on the 4MT plantation after the Effective Date of the Plan.

### 8.1.3  Class 3 - Other Priority Allowed Tax Claims (Impaired)

All Class 3 Claims are paid in full on the Effective Date of the Plan.

### 8.1.4  Class 4 – Old Point Bank Allowed Secured Claim

Section 4.4.1 of the Plan provides as follows:

**Class 4-A:  Old Point Bank**  - Collateral Give Back Secured Claims **Treatment**

The Allowed Secured Claim of Old Point Bank shall be Paid In Full on the Effective Date of the Plan by transfer of all of the Debtor's right, title and interest in the real and personal property described as Four Mile Tree Plantation securing the Class 4-A Secured Claim [more fully described in Old Point Bank's lien document incorporated herein] by the Special warranty deed that, as provided in the Confirmation Order of the Bankruptcy Court, shall constitute Payment in Full of the Class 4-A Allowed Secured Claim. Upon such transfer, the Allowed Secured Claim shall be deemed paid in full, Discharged, and any Note, Loan Agreement, all Loan Documents, and any Deed of Trust will be deemed canceled to the extent of the finding by the Bankruptcy Court of the fair market value of the 4MT asset.  Return of this asset constitues payment in kind, as a matter of law, and a credit on any Allowed Unsecured Claims as a deficiency due by the Debtor or the Co-Proponent must take into account this credit, to the extent of the Bankruptcy Court's finding of the fair market value of 4MT on the Confirmation Date.

Unless otherwise ordered by the Bankruptcy Court in the Order Confirming the Plan, the Class 4-A Secured Creditor shall have no Allowed Deficiency Claim in Class 5-B.

The Class 4-A Claim is paid in full on the Effective Date and is unimpaired.

The Class 4-A Claim and any Class 5-B Claim shall further be subject to the payment of the New Value in exchange for an injunction prohibiting the Class 4-A Claimant and the Class 5-B Claimant from proceeding to collect from the Co-proponent any sums deemed paid "in kind" by this Plan.  Such §105 injunction shall issued on the Confirmation Date, and shall continue as a preliminary injunction until the full New Value has either been paid on the Effective Date, or is paid over time as provided herein, at which time the §105 Injunction will be and become a permanent injunction, with the same force and effect of a Discharge of the Debtor under this Plan.

In addition to this provision, Section 4.4.1.4 of the Plan provides as follows with respect to the Class 4-A Claim:

To the extent of any objection to the treatment under Class 4-A by Old Point Bank and pursuant to § 1129(b), and in particular § 1129(b)(2)(A)(iii) and under

11 U.S.C. § 506, the Debtor requests that this Bankruptcy Court undertake and make (i) a fair market valuation determination and finding, including conducting a valuation hearing as part of the Confirmation Hearing, to determine the current Fair Market Value of the Property transferred to the Class 4-A Secured Creditor in full satisfaction of all Allowed Claims, and  (ii)  make a finding that the treatment of the Class 4-A Claim complies with the "indubitable equivalence" criteria of Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and pays the Class-4-A Allowed Secured Claim in full;  and (iii)  make a finding of any balance remaining due Old Point Bank that may constitute an Allowed Unsecured Deficiency Claim in Class 5-B.

If no arms length, good faith sale is proposed and concluded, the appraised value is the exclusive method of determining the Fair Market Value of 4MT and compliance with § 1129(b)(2)(A)(iii), and shall constitute a payment "in kind" as a matter of law, upon transfer to the Class 4-A Secured Creditor in the amount of the Fair Market Value.

To the extent of any objection to the treatment under Class 4-A because of an claim to a deficiency as a result of the transfer of the Collateral of the Class 4-A Creditor, and the Bankruptcy Court determines that the treatment would result in an Allow Deficiency Claim in Class 5-B, the Bankruptcy Court shall determine the Allowed Amount of the Under-Secured Deficiency Claim which shall be treated, along with other Deficiency Claims, in Class 5-B, and which will establish that amount of the New Value to be contributed to pay in full the Class 5-B Claim.

The Class 4-A Secured Claim is not impaired.

In addition, the Plan provides for a §105 preliminary and permanent injunction upon payment in full of the Class 4-A Allowed Secured Claim, and any Class 5-B Allowed Unsecured Deficiency Claim.

### 8.1.5   Class 5- Unsecured Claims- (Impaired)

Section 4.5.1 provides for the payment of unsecured claims other than secured creditor Deficiency Claims, as follows:

Class 5-A Unsecured Claims - (Impaired)

All Class 5-A Unsecured Claims shall be Paid in Full the Face Amount of the Allowed Claim commencing thirty (30) days after the later of the Effective Date of the Plan, or the date the Class 5 Claim becomes an Allowed Claim, as follows: in six (6) monthly payments of principal only, or as soon as the Debtor deems reasonable.

This Class 5-A is made up of all Unsecured Creditors who are not defined in one of the other Classes, and includes, but is not limited to, the Trade Creditors of the Debtor, as well as Claims related to Disputed Claims, but excludes claims of Insiders and deficiency claims of Secured Creditors.

Any pending Claims that are Disputed Claims (including Disputed Scheduled Claim Amount) will be paid only when all such Claims are liquidated pursuant to Estimation, and fully settled pursuant to an Estimation, agreement of the parties, ADR, Arbitration Proceeding, or Final Order of the Bankruptcy Court.

This Class is impaired.

### 8.1.6   Class 5-B   Under-Secured Deficiency Claim- Old Point Bank

Section 4.5.2 of the Plan provides for the payment in full of the Class 5-B Under Secured Deficiency Claim of Old Point Bank, as follows:

All Class 5-B Claims shall be Paid in Full the Face Amount of the Allowed Amount of the Under-Secured Deficiency Claim only when all such Class 5-A Claims are liquidated and fully settled pursuant to Estimation, ADR, Arbitration Proceeding, agreement of the parties, or Final Order of the Bankruptcy Court.  The Allowed amount of the Class 5-B Claim shall be determined by the Court as the only amount remaining after delivery of the Collateral pursuant to Class 4-A and a determination if such delivery does not constitute payment in full under the Class 4-A.    Upon determination of the Allowed Amount of any Class 5-B Unsecured Claim, the Debtor and Plan Co-Proponent shall elect to:

a.   Pay the Class 5-B Allowed Claim in full on the Effective Date;  or

b.   The Class 5-B Claim shall be paid in 60 months, of equal monthly installments of principal and interest at the rate of 4.5% per month, or in such amount and such time as the holder of the Allowed Class 5-B claim and the Debtor and the Estate agree (at a market rate of interest based on the 90-day Treasury Bill Rate plus 3.25 basis points or as found by the Bankruptcy Court at the Confirmation hearing).

c.   In either event of a cash payment on the Effective Date, or payments over 60 months with principal and interest, the Co-Proponent shall pay, or cause to be paid:

i.   all such amounts provided in the 2013 Simerlien appraisal as Stabilization Costs;  and

ii.   all amounts due or to become due up to 24 months of the Effective Date of the Plan as ad valorem taxes on 4MT;  and

iii.   all amounts due or to become due up to 24 months of the Effective Date of the Plan as CGL casualty insurance for improvements on 4MT;  and

iv.   all amounts due or to become due up to 24 months of the Effective Date of the Plan for caretaker costs described herein.

d.    In the event that the Class 5-B Allowed Unsecured Claim is paid in the 72 months as provided above, the Class-5-B Unsecured Claim shall be further secured by collateral found by the Court to be equal to or in excess of 110% of the Allowed Class 5-B Unsecured Claim.

e.    The New Value contributed by the Plan Co-Proponent is paid in exchange for the §105 injunction that shall (i) collectively and preliminarily enjoin all Entities from proceeding against the Debtor or the Probate Estate as the supplier of New Value pending such terms being set out in the Confirmation Order and thereafter until Paid in Full;  and (ii)  the permanent injunctions as provided in the Plan, Confirmation Order collectively enjoining all Persons and Entities from proceeding against the supplier of the New Value upon payment in full of such New Value.   For all purposes, the Adversary Rules of Procedure are invoked as a result of this Plan filing, unless a specific objection thereto is filed and heard before approval by this Court of the Disclosure Statement, to the extent that the Confirmation hearing shall determine the issuance, scope, and enforcement of the §105 preliminary injunction against Old Point Bank post-confirmation until the New Value is Paid in Full, and the scope of the §105 permanent injunction against Old Point Bank after the New Value is Paid in Full.

f.    As part of the New Value, the Probate Estate shall fund the payment due under the Allowed Class 5-B Deficiency Claim.

g.    This Class is impaired.

**The Debtor's Plan provides for the protection of the "interest" of Old Point Bank, which is all that is required:**  "The generally accepted meaning of the word ['indubitable'] is 'too evident to be doubted.'"[5]  The over-secured creditor is entitled to adequate protection only of *its interest*. Thus, "[t]here is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected." *Matter of James Wilson* Assoc., 965 F.2d 160, 171 (7th Cir. 1992).[6]   Put in other words, a secured creditor does not own the building or the rents that that building throws off month after month, year after year.  It is just a creditor with a claim that it has secured with liens against the building,

---

[5]     *In re Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 448 (Bankr. N.D. Ga. 1994) (quoting *Webster's New Collegiate Dictionary* 583 (1979)); *accord In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) (quoting *Webster's Ninth New Collegiate Dictionary* (1985)).

[6]     Moreover, "a plan that includes the partial return of collateral may be confirmable under certain circumstances. One circumstance occurs where, as here, the creditor is oversecured and the value of the surrendered collateral is equivalent to the amount of the creditor's claim." *Matter of Atlanta S. Business Park, Ltd.,* 173 B.R. 444, 449 (N.D.Ga. 1994). "A security interest is -- a security interest. It is not fee simple." *Matter of James Wilson* Assoc., 965 F.2d 160, 171 (7th Cir. 1992). Moreover, an oversecured creditor "has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest ... There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected ..." *Id. See also, Matter of May,* 179 B.R. 832, 840 (S.D.Ga. 1994) (surrender of less than all townhouse units was indubitable equivalent of secured claim).

and against the rents, to assure repayment.  "It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest. 11 U.S.C. §§ 362(d), 363(e)" *In re Hanna,* 912 F.2d 945, 951 n. 9 (8th Cir. 1990).  *See, also, In re Revco D.S., Inc.,* 901 F.2d 1359 (6th Cir. 1990); *In re Senior Care Properties, Inc.,* 137 Bankr. 527 (Bankr. N.D. Fla., 1992).

### 8.1.7    Class 6 - Interest Holders:

Interest Holders shall retain their interests in the Debtor and are unimpaired, but subordinated to payment of all Class 1, 2, 3 4 and 5 Allowed Claims

### 8.2.    Funding of the Plan

All funding of the Plan shall be provided by the Co-Proponent of the Debtor, the Probate Estate.  This funding is the basis of the § 105 Preliminary and Permanent injunctions in favor of the Probate Estate.

### 8.3.    Claims and Dividends for Payment of Claims:

### 8.3.1.  Provisions for Rejection or Assumption of Executory Contracts

There are no assumed executor contracts by the Debtor.   All executory contracts, if any, will be deemed rejected as of the Confirmation Date.

### 8.4.    Discharge of Debts and General Provisions as Herein Provided

The Plan will discharge the debt and Claims of all creditor by payment (i) in kind, as to the return of the 4MT to Old Point Bank with a credit against the debt or Allowed Secured Claim of 100% of the value determined by the Bankruptcy Court; and  (ii) cash, paid either on the Effective Date as New Value, or paid over 72 months of New Value payments as herein provided, and as secured by the New Value collateral.

### *8.4.1   Releases and Alteration of The Rights of, and With Respect to, Third Parties*

Only upon payment of the Allowed Secured Claim by the in kind return of the 4MT and credit of 100% of the value determined by the Bankruptcy Court and 100% of the Allowed Class 5-B Unsecured Deficiency Claim, all third party liability shall be fully and finally released, including all claims against the Probate Estate.

### 8.5.    Jurisdiction Retained By The Bankruptcy Court

Section 18.1 of the Debtor's Plan, titled **Post Effective-Date Jurisdiction**, is as follows:

"On and after the Effective Date, the Bankruptcy Court will retain and have jurisdiction, to the fullest extent permissible under law, over all matters

arising in, arising under, or related to the Debtors' Reorganization Cases, or that relate to any of the following:

To hear and determine all matters with respect to the assumption or rejection of Executory Contracts, resolution of disputes pertaining to Cure Payment amounts and the allowance of the Claims resulting there from.

To hear and determine any application to modify this Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

To hear and determine any application under Sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by professionals prior to the Effective Date, provided, however, that from and after the Effective Date, the payment of fees and expenses incurred from and after the Effective Date of the retained professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

To hear and determine any dispute or reconcile any inconsistency arising in connection with this Plan, any of the Plan Documents or the Confirmation Order or the interpretation, implementation or enforcement of this Plan, any of the Plan Documents, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing.

To hear and determine any matter concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and Title 28 of the United States Code.

To hear and determine any rights, claims or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code.

To hear and determine any dispute arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to Section 105(a) of the Bankruptcy Code.

To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any

Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court.

To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate this Plan or to maintain the integrity of this Plan following consummation.

To take any action to ensure that all distributions are accomplished as provided herein.

To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, Administrative Expense Claim or Equity Interest.

To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

To take any action to recover all assets of the Debtors and property of the Debtors' estates wherever located.

To enter a final decree closing the Debtors' Reorganization Cases and to enter orders re-opening the Cases.

To hear and determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date, including insurance-related disputes as set forth in Section 11.3.

To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Debtors' Reorganization Cases with respect to any Person.

To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge.

To hear and determine any other matter that may arise in connection with or is related to this Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement.

To hear and determine the Causes of Action retained by the Reorganized Debtors pursuant to this Plan, without limiting the jurisdiction of any other court of competent jurisdiction, if the Reorganized Debtors so elect.

The District Court shall retain such jurisdiction for the purpose of enforcement of this Plan, the 365(f) Order and 365 Sale and the 105 Injunction (whether or not the case remains open or has been closed by Final Decree).

• 18.2 **Abstention**: Only if the Bankruptcy Court, by Final Order, abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to these Chapter 11 Cases, then this section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, including any United States District Court."

### 8.6.    United States Trustee And Fees

The Revested Debtor shall be responsible for paying all fees out of the assets of the Bankruptcy Estate and filing all operating reports required by the United States Trustee.

### 8.7.    Recognition Of Guarantee Rights

The classification of and manner of satisfying all Claims under the Plan take into consideration: (a) the existence of guarantees by the Debtor of obligations of other Persons including other Debtor; and (b) the fact that any or all the Debtor may be joint obligors with another Person or Persons with respect to the same obligation. All Claims against the Debtor based upon any such guarantees or joint obligations shall be discharged in the manner provided in the Plan.

### 8.8.    Satisfaction of Subordination Rights

All Claims against and Equity Interests in the Debtor, based upon any claimed subordination rights against the Debtor or rights to avoid payments or transfers of property by the Debtor pursuant to any provision of the Bankruptcy Code or other applicable law, shall be deemed satisfied as to the Debtor by the distributions under the Plan to Holders of Allowed Claims and Allowed Equity Interests having such subordination rights and any rights to avoid payments or transfers of property. As proposed in the Plan, the distributions to the various classes of Claims or Equity Interests hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim or Equity Interest including, but not limited to, the Secured Lenders, by reason of any claimed subordination rights or otherwise of the Holder of a Claim or Equity Interest against the Holder of an Allowed Claim or Allowed Equity Interest, except to the extent provided in section 4.2(g) (5) herein. The Court, in its Order confirming the Plan, shall permanently enjoin, effective as of the Effective Date, all Holders of Claims and Equity Interests from enforcing or seeking to enforce any such rights against any Person with respect to distributions to the Holders of Allowed Claims and Allowed Equity Interests under the Plan. Distributions under the Plan shall be subject to and modified by any order pursuant to which a party in interest obtains Bankruptcy Court approval of distributions other than those proposed in the Plan, which distributions take into account the subordination

rights of Holders of Allowed Claims and Allowed Equity Interests between and among themselves, or as otherwise provided in the Plan.

## 9.    INSIDERS AND AFFILIATES TO THE DEBTOR

### 9.1.    Owner of the Debtor

The Debtor's corporate equity holder is the Co-Proponent.

### 9.2.    Affiliates of the Debtor – the Probate Estate

The Co-Proponent owns 60% of the issued and outstanding LLC Membership Interest of the Debtor.

### 9.3.    Insider Dealings Within One (1) Year

1.    The Co-Proponent has executed a personal guaranteed debt of the Debtor to Old Point Bank, and has personally advanced over $2 million within the last thirty-six months to the Debtor for the direct benefit of Old Point Bank.   The Co-Proponent disputes the liability on the guaranty.

2.    Within the past year the Co-Proponent has funded to the Debtor all payments made on debt service, taxes, costs and expense of operations, and has agreed to fund on the Effective Date, the payment in full of the Class 5 Claims as provided in the Plan.

3.    No insider has obtained or taken any distribution in cash or in kind, from the Debtor.

## 10.    PRESENT CONDITION OF THE DEBTOR

### 10.1.    Disclaimer of Transcription

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.

**WHILE THE DEBTOR HAS MADE EVERY EFFORT TO RETAIN THE MEANING OF SUCH OTHER INSTRUMENTS OR THE PORTIONS TRANSPOSED, THE DEBTOR URGES THAT ANY RELIANCE ON THE CONTENTS OF SUCH OTHER INSTRUMENTS SHOULD DEPEND ON A THOROUGH REVIEW OF THE INSTRUMENTS THEMSELVES.**

### 10.2.    Source of Information

Unless expressly stated hereinafter, the Debtor's management has supplied the information of fact, and has made the estimation of values, as contained in this Disclosure Statement. The information contained in this Disclosure Statement has been obtained from

several sources, including Debtor's management and pleadings filed in pending litigation involving the Debtor.

### 10.3.    Daily Operations of the Revested Debtor will not change

### 10.4.    Financial Valuations

All projections as to value have been based on Debtor's estimates of value in an orderly management process.

#### 10.4.1. *Disclaimer of Financial Statements and Exhibits*

The financial information is believed to be materially accurate and properly presented for the intended use;

> **HOWEVER, NONE OF THE ACCOUNTING INFORMATION IS THE SUBJECT OF, NOR HAS IT EVER BEEN THE SUBJECT OF, AN AUDIT BY ANY CERTIFIED PUBLIC ACCOUNTANT OR ANY GOVERNMENTAL AGENCY. ALTHOUGH THE DEBTOR BELIEVES THAT THE INFORMATION CONTAINED IN ALL SUCH FINANCIAL RECORDS IS REASONABLY AND MATERIALLY ACCURATE, THE DEBTOR DOES NOT INSURE THEIR ACCURACY.**

## 11.    VOTING CONSIDERATIONS

### 11.1.    Exclusivity

In a business chapter 11 case, the Debtor is the only possible proponent of a Plan of Reorganization during the initial one hundred twenty (120) days of the proceedings unless certain special conditions, not present in this case, are met (appointment of a trustee or reduction of the one hundred (100) day period by the Bankruptcy Court). After that one hundred twenty (120) day period, any Party-In-Interest may propose a Plan of Reorganization. The Exclusivity Period has expired. No competing Plan has been filed and there has been no interest expressed by anyone to file such a Plan.

### 11.2.    Statutory Requirements

Section 1126(c) provides that a Class of Claims has accepted a Plan if it is accepted by holders of Claims representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such class that have actually voted to accept or reject the plan.

### 11.3.    Non-Voting Classes

The Code provides that two types of classes need not vote on a Plan but rather, will be deemed to have voted to accept or reject such Plan. Section 1126(f) provides that a class which is not impaired under the Plan, such as a class receiving payment in full in cash upon consummation, is deemed to have accepted the Plan. On the other hand, Section 1126(g) states

that a class not receiving any consideration under the Plan is deemed to have rejected the Plan. Section 1126(b) provides that the Court may, if so requested by the proponent of the Plan, confirm the Plan if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class of Claims or interests.  The Code standard is that no Junior Class may receive any property until the members of a dissenting Senior Class have received the full allowed amount of their Claims or interests.

### 11.4.    Fair and Equitable Treatment

The Bankruptcy Court can confirm the Plan at the request of the Debtor if all the requirements of Section 1129(a) of the Bankruptcy Code except Section 1129(a)(8) are met and if at least one non-insider Class of Claims that is impaired under the Plan has accepted the Plan, and if, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or equity interests. "Fair and equitable" has different meanings for Secured and Unsecured Claims and holders of equity interests.

#### 11.4.1. Secured Claims

"Fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the Allowed amount of its Claims with a present value as of the Confirmation Date at least equal to the value of such creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) hereof, or (ii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

#### 11.4.2. Unsecured Claims

The fair and equitable requirement in the context of a class of unsecured claims requires that either:

1.     Will the reorganized company be able to meet its fixed and contingent payment obligations provided for under the Plan as well as obligations incurred in the ordinary course of its business;

2.     Will the Debtor be able to generate future cash flow sufficient to make payments called for under the Plan and continue in business;

3.     Is there an absence of other factors which might make it impossible for the Debtor to accomplish the reorganization.  In considering feasibility, i.e., that Confirmation is not likely to be followed by liquidation or further reorganization, the Court is only required to determine whether the Plan can be performed by the Debtor.  Several factors must be considered

by the Court to determine whether a Plan is feasible, including:  what it promises to accomplish in the Plan or continue its existence as contemplated in the Plan.

In addition, in order to confirm the Plan, the court must find, among other things, that the Plan was proposed in good faith.

### 11.4.3. Equity Interests

"Fair and equitable" means either (i) each impaired equity interest receives or retains on account of such interest property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property.

## 12.   ALTERNATIVES TO THIS PLAN

### 12.1.   General Discussion

The Debtor does not know of an alternative to the Plan which would render more likely a higher dividend to the Creditors.  The only other known alternative would be liquidation of the Estate under Chapter 7.

**UNDER THE PLAN IT IS BELIEVED THAT THE ALLOWED CREDITORS WILL RECEIVE A DIVIDEND, AT A MINIMUM, AT LEAST EQUAL TO THAT DIVIDEND WHICH WOULD BE RECEIVED IN A LIQUIDATING (CHAPTER 7) BANKRUPTCY. IT IS ALSO BELIEVED THAT ALLOWED CLAIMS WILL RECEIVE A GREATER DIVIDEND UNDER THE PLAN THAN IN A LIQUIDATING BANKRUPTCY.**

### 12.1.1. Estimated Return To Creditors Under A Chapter 7 Liquidation:

It is the Debtor's opinion that there would be no return to Unsecured Creditors in a Chapter 7.

Based upon Old Point Bank's demands there will be no payments to any unsecured creditor, or any under-secured claim of Old Point Bank, absent Confirmation of this Plan, then absent successful litigation in the Probate Court as to Old Point Bank's position that it has an guaranty.   All other unsecured creditors will have no recovery.

Old Point Bank demands either a right to foreclose on the 4MT lien and has indicated its intention to allow or provide only a credit against the Debtor's outstanding obligations that would leave more than $1.5 million deficiency claim, assuring that no Class 1, 3, or Class 5-A creditor would be paid any distributions or dividend.

### 12.1.2  Estimated value of the Interest of the Debtor:

The appraisals commissioned by the Debtor shows that the Debtor's interest in the 4MT asset is in excess of $3 million.   Old Point Bank disputes this amount.  However, Old Point Bank's own appraisal shows a fair market value (discounted to present value) of more than $2.7 million.

## 13.    LITIGATION IN INSOLVENCY AND NON-INSOLVENCY  CONTEXT

### 13.1    Suits or Potential Suits  (Statement of Value and Expectancy)

Described above is the Probate Court litigation commenced in Nueces County, Texas by Old Point Bank against the Probate Estate, and based upon a purported guaranty.

The Debtor is a party to that litigation as a result of a Third Party Plaintiff claim brought by the Probate Estate against the Debtor for indemnity in the event that the Probate Estate is found to be liable to Old Point Bank.

### 13.2.    Avoidance or Other Bankruptcy Litigation

The Debtor is not aware of any avoidance litigation that will be brought.

The New Value contributed by the Plan Co-Proponent is paid in exchange for the § 105 injunction that shall (i) collectively and preliminarily enjoin all Entities from proceeding against the Debtor or the Probate Estate as the supplier of New Value pending such terms being set out in the Confirmation Order and thereafter until paid in full; and (ii)  the permanent injunctions as provided in the Plan, Confirmation Order collectively enjoining all Persons and Entities from proceeding against the supplier of the New Value upon payment in full of such New Value.   For all purposes, the Adversary Rules of Procedure are invoked as a result of this Plan filing, to the extent that the Confirmation hearing shall determine the scope of the § 105 preliminary injunction against Old Point Bank post-confirmation until the New Value is paid in full, and the scope of the § 105 permanent injunction against Old Point Bank after the New Value is paid in full.

### 13.3    Retention of General Claims and Settlement Rights of Claims

Section 9.5, 9.6 and 9.7 of the Debtor's Plan provides as follows:

Except as hereinafter provided, as to any Claim or Cause of Action which can be retained and enforced by the Debtor and which shall not have been settled or adjusted by this Plan, the Debtor shall retain the right to enforce or settle such Claim or Cause of Action for its benefit.  Failure to object to a claim is not a waiver or an impediment, in any way, to the Debtor and/or Reorganized Debtor's rights to pursue any and all claims it has against any Creditor.  Confirmation of the Plan is not a waiver or an impediment, in any way, to the Debtor and/or Reorganized Debtor's rights to pursue any and all claims that exist against any Creditor or Non-Creditor.

Neither the filing of the Plan, nor any statement or provision contained herein, nor the taking by the Debtor, the Reorganized Debtor, or any Creditor of any action with respect to the Plan shall be deemed to be an admission against interest, collateral estoppel, issue preclusion, by the Debtor in any pending or in any subsequently filed litigation, or in any way negatively impact the viability of any rights the Debtor had prior to such action or Confirmation of this Plan.

The Debtor specifically reserves for the estate any as yet unknown claims, or any claims that have not yet arisen or become ripe for recovery or a legal or equitable remedy.  To the extent practical, the Debtor shall disclose and described in the approved Disclosure Statement, and any supplements thereto, of all known claims that specifically survive the Confirmation of the Debtor's Plan.

## 14.    RISKS OF PLAN

All Chapter 11 reorganizations inherently have risks.  This Plan has, however, very little risk in the view and opinion of the Debtor, as a result of:

i.    The immediate return to the Secured Creditor Old Point Bank of the 4MT estate, at the fair market value determined by the Court as payment in full of the Class 4 Allowed Secured Claim; and

ii.    The immediate cash payment on the Effective Date of all Class 1, 2, 3 Allowed Claims; and

iii.    The immediate cash payment of all Class 5 Allowed Unsecured Claims on the Effective Date, or alternatively, the payment over time of the Allowed Class 5-B Claim fully secured, with interest.

Thus, the Risk of Plan performance is minimal.

## 15.    CREDITORS COMMITTEE

There has been no creditors' committee appointed in this case and such appointment by the United State Trustee is not likely.

**16.**     **REQUEST FOR APPROVAL**

WHEREFORE, the Debtor, Four Mile Tree, LLC and the Probate Estate as Co-Proponents of the Chapter 11 Plan of Reorganization, submit this Disclosure Statement and the information contained therein, in good faith and in accordance with the provision of Title 11, U.S. C. § 101, *et seq*., for consideration by Creditors and other Parties-in-Interest, and as the sole source of information furnished by the Debtor, or to be furnished by the Debtor, in solicitation of acceptance of the Debtor's Plan of Reorganization.

Respectfully Submitted,

**Four Mile Tree, LLC**
Debtor, and Debtor-In-Possession

By:     */s/ Lynn Cates*_____
Lynn Cates,
Chief Financial Officer
Debtor and Debtor-In-Possession

Shelby A. Jordan
State Bar No. 11016700
Federal ID 2195
**Jordan, Hyden, Womble,**
**Culbreth, & Holzer P.C.**
500 N. Shoreline, Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
**Counsel to the Debtor**

By:     */s/ Wayne Lundquist*_____
Wayne Lundquist, Independent Executor
Estate of William O. Harrison, Jr.

Michael B. Schmidt
State Bar No. 17775200
Law Offices of Michael B. Schmidt
401 Grant Place
Corpus Christi, TX 78411
Telephone: (361) 884-9949, ext. 914
Fax: (361) 884-6000
**Counsel to the Estate**